This appeal arises out of the ITC's decision to uphold the part of an ALJ's granting of a motion for summary determination, which was filed by Philip Morris USA, the intervener here, that there was a violation of Section 337 of the Tariff Act by reason of an unauthorized person. It was an infringement of the intervener's registered U.S. trademarks for Marlboro, for Parliament, and Virginia Slims. And specifically, the reason for the infringement was because the ITC found a material difference between the so-called gray market products and the products manufactured by the intervener. And that material difference was the absence of the Surgeon General's health warning as a label on the cigarettes. We maintain that the ITC erred in determining that the intervener had not authorized the gray market imports into the United States. The ITC focused only on a time period after March 28, 2008. That time period happened to coincide with when Philip Morris International, that was the foreign producer of these cigarettes, was spun off from the Altria Group. And it also coincided with when the intervener filed the ITC Section 337 complaint. The ITC reasoned that because there was no connection, present connection, between the intervener and PMI as of the date the complaint was filed, therefore there was no possibility for it to have authorized any sales or imports by PMI. We believe this approach is erroneous, that the use of this date ignores virtually all of the crucial events that occurred in this case, and they all occurred prior to March 28, 2008. The ITC also ignored its own precedent in this case. Its own precedent would have called for it to establish a representative time period for looking at the impact of imports for five years in the Bordeaux case, and for also a five-year period in the Berings case, in which it could assess the impact of imports on authorization, and also on the volume and impact of these imports on the all or substantially all analysis. Now, this was needed, a representative time period prior to filing of the complaint was needed to properly make these assessments. Now, when it comes to authority, apparent authority on which a lot of the authority here would be based is not made in an instant or a short period of time. It covers a lengthy period of time. You're looking at the conduct of parties over a period of time. It just doesn't happen within a month or two. But the ITC did not look at that. In addition, we have here statements by the intervener that it didn't authorize imports, and that it did a lot of policing of imports. Now, its denials that it didn't authorize infringing imports are somewhat erroneous, as became evident in intervener's efforts to ensure that infringing cigarettes, which were referred to as personal use cigarettes produced by PMI, or the same as the duty-free imports, were allowed to enter the U.S. pursuant to its personal use exemption that it had proposed for inclusion in the ITC's order of exclusion. Personal use, I take it, is when somebody comes back from Ukraine, Russia, wherever these things are made, and brings a pack of cigarettes with them. That's correct. The ITC incorporated the personal use exemption in its final order. Our position is that, at the very least, the submission by the intervener of the personal use exemption represented acquiescence and authorization to entry of these infringing imports. The record, as it now stands, contains no data on duty-free imports and only partial data with respect to gray market imports that intervener actually admits that it authorized in the United States, but only for the year 2006. We submit that the ITC erred in not requiring full data on both duty-free imports and for all years in which these other imports that actually went to foreign embassies in the U.S. had come to the United States, because we believe that these are all relevant to the All or Substantially All analysis. Now, the embassy program has ended a few years back, right? Yes, that's correct, but we don't know how much was involved before that. At the time the investigation was initiated, we're talking about 2008, so it sounds like it's more distant now than it was then, but it was fairly recent then. And so, if you look at a five-year time period, this would have captured a number of years where those imports were taking place as well. We maintain the ITC erred as a matter of law in granting interveners motion for summary determination. The record was incomplete. We maintain just simply premature. To the extent facts existed, we believe there are genuine issues of disputed facts. That is, whether the ITC had in fact captured all authorized imports, and whether it had authorized the duty-free imports, and also whether in the period before March 28, 2008, prior affiliations between intervener and PMI resulted in any actual or apparent authority to import, export, distribute, and sell infringing gray market cigarettes in the United States. The second issue we have here is, is this even a gray market case? We submit it as not. In the last three cases this Court considered, where the issue of gray market imports arose, we're talking about Gamut, Bordeaux, and SKF. The Court consistently defined gray market goods as products produced by the owner of the U.S. trademark or with his consent, but not authorized for sale in the United States. In virtually every case cited by the parties in this appeal, there was a license for agreement between the parties. Let me interrupt you if I could, and I just want to make sure of the facts that I wasn't clear on. Do we know where and by whom these cigarettes were made? By PMI. By PMI, not by, these were not cigarettes that were made in the United States, sent overseas, and then shipped back. That was part of the story, but prior... Right, right. But as to the current situation, if Alcizia gets a request, that's the pronunciation, gets a request from me for cigarettes, I'm going to get cigarettes that were not made in the United States, correct? You're going to get cigarettes made by Philip Morris International. Ukraine, or where? Wherever. Okay. Go ahead. Okay. In this case, the intervener claims it has no license or agreement with PMI. Accordingly, they ignore the first part of this Court's definition of gray market goods. They only focus on that part which says the goods are not authorized for sale in the United States, and claim that this is all that is needed to make a gray market case. Now, without intervener's manufacture or consent to manufacture cigarettes under its U.S. trademarks, this cannot be a gray market case. Well, suppose it's not a gray market case. It's still a trademark case, isn't it? Why isn't the exact same kind of analysis applicable, except for the fact that you've got a more traditional trademark analysis, a more traditional trademark rubric? That would work, Your Honor, if two conditions were met that are not present here. One is that PMI would necessarily be a party to regular trademark, because it is, after all, the foreign manufacturer of the infringing products. If there is no relationship between the intervener and PMI, there should be absolutely no bar to intervener bringing in PMI as its party to litigation. It's not a party to this litigation. It never was. The second issue is... Why is it a necessary party? If I'm infringing a trademark by making secondary sales of something that some manufacturer who doesn't have the right to make those sales or to distribute them in the United States, if I distribute those in the United States, I've infringed the trademark. The source. If you want to stop the source of the imports... That would have been... The Commission might have chosen to do that, but there's nothing wrong with going after the immediate importer, is there? There wouldn't be necessarily anything going wrong, but you still have a second problem. All right. What's the second problem? The second problem is these are genuine products. Under the Lanham Act... Genuine products in this instance? Because they are exactly the identical products that are made in the United States, except for the Surrogate General's warning. But that is the material difference. The material difference wouldn't be relevant in this trademark infringement case. So you would have products that are... I'm not sure I understand what you mean by these are the same product. If I happen to come up with the formula for Coke, I stumble across it, I can't go over to Mexico, make genuine Coke, the exact same thing, put it in Coke-type bottles, use Coke bottles, and then bring it into the United States and say there's no trademark infringement because it's the same as Coke, right? Well, that may be the case if you're unrelated. In this case, you're talking about companies that are previously related. I mean, it would be very difficult for somebody to see how... There must have been some relationship. That's one of the things that we're saying, material fact and dispute. There was a relationship, and we don't know the extent of the relationship. That's why we believe summary judgment was premature. That if we found this out, we might find the answer, that in fact these are genuine. If they are genuine, I don't think you could get this as a straight trademark infringement case. We also maintain that the absence of the Surgeon General's warning is not a material difference. This comes up in a strange way. The ITC defined the consumer in this case as a habitual smoker who purchases cigarettes by the cart. This type of a smoker is pretty much a dedicated smoker. He knows this might hurt him. Now, what difference would a label make to this person? It might make a difference to a first-time smoker, but not to a habitual smoker. That's one reason. We don't think it applies as a material difference here. Secondly, we maintain that the intervener itself is being inconsistent. In other litigation, it has not included the Surgeon General's warning as a material difference, although it included the other claims that it had before the ITC. We don't understand the precise reason why, but there is certainly— I'm talking about the Vallis case and the Allen Distributors case. There, we have quality control, we have the ICCA, but we do not have the Surgeon General's warning as material differences. So the implication seems to me you'll have some purchases where this label might make a difference to, but others that it doesn't. I think this undercuts their position. The final thing is in the public interest factors. I'll be real quick about this. ITC maintains that we weren't adversely affected by the PU exemption. While I think that's wrong, we are injured by it. If the duty-free exemption were removed, it would then take the cigarettes into the category of goods, which are included with the all-or-substantially-all test. Right now, they're out of it. If they were, we would resubmit that this would prompt the ITC to come with a negative determination, hence the injury that we have. Thank you very much. Thank you, Mr. Seibert. Mr. Valencia? Good afternoon, and may it please the Court. All of the material facts in this case are undisputed. The Commission correctly found that 100% of all cigarettes authorized for U.S. commerce by PMUSA are materially different from the accused cigarettes imported by Alcesia. Here's what we know is undisputed. PMUSA owns the U.S. trademarks, and only PMUSA can authorize their use in U.S. commerce. We know Alcesia's imported cigarettes bear the trademarks at issue, but use foreign-language labeling rather than the Surgeon General's warning, in violation of various federal laws established for the protection of consumers and U.S. trademark holders. We know that PMUSA has never expressly authorized the importation or sale of the accused cigarettes. Why is the label for protection of trademark holders? Well, Your Honor, the ICCA is pretty specific that in order to import cigarettes, it's got to have the consent of the trademark holder, which there's no dispute, Alcesia does not have this consent. Right, right. I thought you said that the label on the cigarettes, maybe I misunderstood what you're saying, was required to be put on the cigarettes by, I guess it's the FDA, but it's required to be put on to protect the consumer, sure, and the trademark holder. My recollection is that the trademark holders weren't all that eager to have this label stuck on their cigarettes. Well, yes, it's an interesting question, Your Honor, and it's primarily for the benefit of consumers. But, you know, there's this scenario under our trademark law where it's possible that PMUSA wants to be known as a company that complies with all U.S. laws for consumer safety, and if accused cigarettes are allowed to be imported and sold, a reasonable consumer may see that and say, PMUSA is not complying with its obligation. Was that an issue, that they would be sold without the application of the safety label? That is the material difference on which the Commission based its determination. Yes, I know, but they haven't been sold, but they're imported. My general understanding was that by the time they hit retail sales, they may or may not have the safety label, but that there was no understanding that they would not. If I understand Your Honor's question, it's whether after they've reached the United States… I don't understand why it would make a difference whether when they ultimately hit retail sales, they did or didn't have the safety label. Well, it makes a difference because Congress has made a determination that these warnings are sufficiently important to warn all consumers, and it's not for Alcesia or the Commission. Let me see if I understand how this safety label thing works. I order a couple of cartons of Marlboros from Alcesia, and what I get, I take it, is not atypically at least a cigarette package that looks like the one on page 7 of your brief, which has the Surgeon General's warning in Ukrainian, right? Well, no, actually, Your Honor, it doesn't even say Surgeon General's, and that's part of the issue. Well, it doesn't say Surgeon General, but it says in Ukrainian. It says that smoking causes lung cancer and cardiovascular disease. Right. Right, okay, and that, I take it, is the way, it's right on the pack, where the Surgeon General's warning would appear, right? And that, it goes out into Commerce, into my pocket, or, you know, if I give copies of other packs to friends, it goes out with that warning on. Is that correct? And that's attached to the pack? I'm not, I don't actually have a physical specimen, but it's my understanding that these labels are plastered onto the front of the pack, and that's how it goes into U.S. Commerce. Right, okay. So, another material fact that I also think is... I would have thought that the Commission would have been arguing something along the lines that when you have something in a foreign, obviously foreign language, that it suggests that maybe Philip Morris' cigarettes, Marlboro's are generally made in some, in Ukraine or somewhere else, which might give consumers some reason to doubt the... That is, that is... That didn't seem to be part of your argument. No, actually, Your Honor, it is. It very much is the Commission's position... But it's not part of what the Commission ultimately found to be the problem. The Commission found that these foreign language labels could give rise to any number of mistaken impressions. For example, the one that you just mentioned, a smoker who's used to seeing the Surgeon General's warning on the cigarettes for 40 years may buy a pack from Alcesia and wonder whether or not Philip Morris USA has moved all its operations abroad, or maybe now that these cigarettes actually come from Philip Morris and it's trying to put them in foreign languages where consumers can't understand them. Any type of confusion here that could occur in the mind of a consumer is trademark infringement. And the Commission actually did make an alternative finding on that. The Commission found under the gray market framework that material differences exist for two primary reasons. The Congressional determination, which the Commission doesn't question Congress's judgment on the FCLAA, and also simply that consumers would be confused by that, by seeing the foreign language label on the front of the package in a language that it wouldn't understand where it's used to seeing these Surgeon Generals on the side of the package. And as this Court's precedent has held, for example, in gamut trading, a material difference is a labeling difference in a foreign language particularly, especially when the law requiring this labeling is enacted for the benefit of consumers. Now I'd like to address a few points in Alcesia's reply brief, namely the duty-free sales and the embassy sales. As to the embassy sales, Mr. Zeitler was incorrect. The record actually shows in a sworn affidavit submitted by PMUSA that the embassy sales ended in 2006 and extended between 2003, five years before the complaint was filed, and 2006 when they ended. And in every year, these sales never exceeded two hundredths of one percent. Under any standard, these sales are negligible, and they do not impact the all or substantially all analysis. In any event, these sales ended well before the complaint was filed, and foreign embassies are typically treated differently than U.S. territory. This is not regular U.S. commerce. As to the duty-free imports, Alcesia argues... determine whether we agree with the ALJ's characterizations of these sales as de minimis. It sounds like you're saying, well, they were de minimis. Are you asking us to uphold the commission on the ground that it did not employ them? No, Your Honor. The commission found that these sales are irrelevant. They're irrelevant because they ceased years before the complaint was filed. Are they irrelevant because they're de minimis? Are they irrelevant because there's some other reason that relevance is not present? They're irrelevant for other reasons, Your Honor, and those are that they ceased well before the complaint was filed, and also they're foreign embassies. They're sales to diplomats. These are not U.S. consumers. And actually, the FCLAA recognizes this by not requiring the Surgeon General's warning in cigarettes sold in U.S. embassies and foreign embassies in the United States. I see that my time's about expired, and if Your Honors have no further questions, I'll conclude my remarks. We will go ahead with your calling. Mr. Chernow. Good afternoon. Thank you very much. My name is Ken Chernow. I'm counsel for Philip Morris USA, the intervener in this matter, and I hope you can hear me okay. I have a cold, and I'm just recovering, so hopefully I'm speaking clearly enough for you this afternoon. I'd be happy to answer any questions the Court has, but I'd like to start by saying that I think this is a fitting follow-on to the never-ending deer litigation that this Court has been grappling with over the last handful of years. In the deer litigation, as the Court well knows, the core issue seems to have been over and over again not whether the complainant in that case had established material differences. That was fairly well settled. The key question was the second part of the gray market analysis. Did the complainant establish that all or substantially all of its authorized U.S. sales lacked the material differences of the accused audience? Do you see this really as a gray market case or as a more conventional trademark case or both? Which is the better way to view it, and does it matter? I guess is the other question. It's a good question, Your Honor. I view this as a gray market case, straightforward gray market case, typical starting with the Supreme Court's decision in the Bourgeois v. Katzel case and the decisions of this Court. A gray market case involves the sale of Let me read the Court's definition, actually. As this Court held in the Bordeaux case, gray market law is not concerned with whether the trademark owner authorized the use of the trademark on that product in another country. Instead, gray market law is concerned with whether the trademark owner, Philip Morris USA in this case, has authorized use of the trademark on that particular product in the United States and thus whether the trademark owner has control over the specific characteristics associated with the trademark in the United States. And as a result, this Court considers as gray market cases really any case in which a foreign good bearing the same U.S. trademark is being brought in and resold to United States customers in violation of U.S. markholders' consent or rights. You could look at it as a straightforward trademark infringement case. I think that would not be inappropriate. Wouldn't my Coca-Cola case be viewed just as a trademark infringement case? It could be, but it is also a gray market case. Well, I guess then labels may add more confusion than assistance in this case. Possibly so. And this Court has established a particular way of analyzing gray market cases and establishes what it has described repeatedly as a very low threshold. It is clear, is it not, in the record, as I think Mr. Valencia said, that these cigarettes, the ones that are the subject of the importation, were made elsewhere. They were made outside of the United States where we don't know, but they are not original PMUSA-made cigarettes. The cigarettes at issue in this case are cigarettes that were made for sale outside the United States by Made outside the United States or made for sale? Made for sale outside the United States. But do we know where they were actually manufactured? Well, excuse me, Your Honor, the respondent in this case, the appellant, Alchezia, acquires its cigarettes however it acquires them. So it may acquire Moldovan cigarettes in some instance, Ukrainian cigarettes in another instance. It is hard to pinpoint precisely who the manufacturer was of the cigarettes, but yes, they were manufactured outside the United States. Certainly the labels had to be put on outside the United States because I assume that PMUSA, I don't know for sure, but I would assume that PMUSA doesn't have a variety of labels in other languages. Every pack of cigarettes manufactured by Philip Morris USA bears the labeling that has been asserted in this case. In English. In English, the U.S. Surgeon General's warning, which is required in tremendous specificity by the Federal Cigarette Labeling and Advertising Act, FCLA, which doesn't just say you need to have a Surgeon General's health warning on there. It says it must be in English. It specifies the type, size, typeface, the location on the pack of cigarettes, and it allows for no exceptions and no variation. Indeed, the Imported Cigarette Compliance Act, which has been discussed and which I'll get to as well, specifically incorporates FCLA and requires that cigarettes imported into the United States must have that FCLA warning in the exact English language, size, font, location affixed to the pack as all other cigarettes in the United States. Otherwise, they're excludable. As I was saying before the court's good questions, I do think this is really the follow-on to Deere. This is sort of the anti-Deere case, if you will, in the all or substantially all analysis. In the Deere case, the court grappled with the question of actual authority and apparent authority in trying to determine what products ought to be considered as authorized sales to go into the formula for determining what percentage of U.S. sales of gray market products were authorized. In this case, there is no dispute, there is no rebutted evidence, no evidence to rebut the showing that Philip Morris made that it provided no actual authority for anyone to import gray market products. And that is evidenced by not just the sworn affidavit testimony, which went unrebutted, but also by the ICCA itself, which specifies that in order for a U.S. markholder to provide consent for gray market products, gray market cigarettes, to be sold in the United States, they have to evidence it by way of a sworn affidavit. And there's no evidence of that here. There was none. Indeed, Alchezius, representative in deposition, conceded no, had no consent in Philip Morris USA. In addition, to the extent the court is going to look at the question of apparent authority, which I know was the subject of some additional discussion in the second Deere opinion, there's also absolutely no evidence to suggest that Philip Morris USA did anything even close to what was at issue in Deere to demonstrate apparent authority. So unlike Deere, where you had Deere setting up the machinefinder.com website to facilitate arguably gray market transactions, where it was helping to finance gray market sales of tractors into the United States, to the contrary, Philip Morris USA has filed dozens of lawsuits against those who engage in gray market sales. It has sent hundreds of cease and desist letters to those who engage in gray market sales and perhaps most saliently sent seven cease and desist letters to this very respondent and one to its supplier telling them that these sales are not authorized and we are going to sue you if you keep doing this. And that's exactly what happened. So it sits ill in the mouth for Alchezius to come into court now and say, well, nonetheless, we had apparent authority to engage in these gray market sales to the United States. This case could not be more clear and more of a counterpoint to the situation presented in Deere. Your Honor, my time is up. I'm happy to answer any questions the Court may have. Any questions? Any questions?  Thank you very much. Thank you, Mr. Chernoff. Mr. Zagreb, you have some rebuttal time. Thank you. Please, the Court, with respect to the argument that Philip Morris USA never manufactured these cigarettes in the United States, that is not true. They've been doing it pursuant to an agreement with Philip Morris International for years. This agreement just terminated in October of 2008. An entire plant in the United States was devoted to manufacturing cigarettes without the Surgeon General's warning for years. With respect to the comments made about apparent authority, all these comments show that the record was incomplete. We don't know just what happened back then, and this is one of the reasons we filed this appeal. Now, when it comes to the embassy sales, they're still in the U.S. commerce. That's all that's required. We're not required to show that, well, did this diplomat actually walk into U.S. territory and smoke a cigarette or not? I think we can pretty well presume that. That's not a distinguishing feature. With respect to the embassy data that was there since 2003, then why give us only data until 2006? I think we're entitled to all of the data, so we can make our own determination. Concern was also expressed as to who was actually manufacturing the cigarettes and under what authority. PMI and its subsidiaries have in Europe trademarks that are identical to the U.S. trademarks that Philip Morris USA has. There is no evidence that I have seen that anybody other than PMI has made these cigarettes that are coming to the United States as free market imports. That is my presentation. Thank you. If you have any questions. Okay. Thank you, Mr. Zeigler, Mr. Lansing, Mr. General. Please just take it away.